KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
Howard Weitzman (SBN 38723)
 hweitzman@kwikalaw.com
Jonathan P. Steinsapir (SBN 226281)
 jsteinsapir@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

Attorneys for Plaintiffs MJJ Productions, Inc., Optimum Productions, Inc., New Horizons Trust III, LLC (d/b/a MIJAC Music), The Michael Jackson Company, LLC, and MJJ Ventures, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| MJJ PRODUCTIONS, INC., a California corporation, OPTIMUM PRODUCTIONS, a California corporation, NEW HORIZONS TRUST III, LLC, a Delaware limited liability company, d/b/a MIJAC MUSIC, THE MICHAEL JACKSON COMPANY, LLC, a Delaware limited liability company, and MJJ VENTURES, INC., a California corporation,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>THE WALT DISNEY COMPANY, a Delaware corporation, ABC, INC., a Delaware corporation, and DOES 1 through 10, inclusive.<br><br>　　　　Defendants. | Case No. 2:18-cv-04761 PSG (SKx)<br><br>The Hon. Philip S. Gutierrez, United States District Judge, presiding<br><br>**FIRST AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**Action Filed:** May 30, 2018<br>**Trial Date:** Not Set |

## JURISDICTION AND VENUE

1. This is a copyright infringement case by the Estate of Michael Jackson, through various companies, against The Walt Disney Company and ABC, Inc.

2. This court has original and exclusive jurisdiction pursuant to 28 U.S.C. § 1338(a).

3. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(a), because defendants and their agents reside in, or may be found in, this district.

## FACTUAL ALLEGATIONS

4. The Walt Disney Company is one of the world's largest media conglomerates. Its affiliates include Walt Disney Pictures, Pixar, Lucasfilm, Marvel Entertainment, ESPN, and ABC, Inc. (collectively "Disney"). Disney controls some of the most beloved characters and stories in modern culture, such as: Mickey Mouse, Donald Duck, and friends; classic animated films like *Peter Pan*, *Cinderella*, *Pinocchio*, and others; Pixar's modern animated classics (acquired by Disney) like *Toy Story*, *Finding Nemo*, *The Incredibles*, and other Pixar films; the *Star Wars* franchise; Spiderman, the X-Men, and other characters and stories from the world of Marvel Comics; and ESPN's popular *30 for 30* documentary series.

5. Disney's media business depends on its intellectual property and, more specifically, the copyrights it holds in its well-known characters, motion pictures, music, and the like. Disney has never been shy about protecting its intellectual property. Indeed, its zeal to protect its own intellectual property from infringements, real or imagined, often knows no bounds.

(a) Disney has threatened to sue independent childcare centers for having pictures of Mickey Mouse and Donald Duck on their walls, forcing them to remove all pictures of Mickey or Donald—and other anthropomorphized mice or ducks—rather than face ruinous litigation from one of the world's largest corporations.

(b) Disney once sued a couple on public assistance for $1 million when they appeared at children's parties dressed as an orange tiger and a blue donkey. Apparently, these costumes cut too close to Tigger and Eeyore for Disney's tastes.

(c) Disney takes a very narrow view of copyright law's "fair use" doctrine. For example, just a few years ago, it sent DMCA takedown notices to Twitter, Facebook, and other websites and webhosts, when consumers posted photographs of new *Star Wars* toys that the consumers had legally purchased. Apparently, Disney claimed that simple amateur photographs of *Star Wars* characters in toy form infringed Disney's copyrights in the characters and were not a fair use.

6. In light of all of this, the plaintiffs in this case—various companies that comprise a part of the Estate of Michael Jackson (collectively, "the Estate")—were genuinely shocked when they watched Disney's prime-time two-hour television program, *The Last Days of Michael Jackson*, which aired in prime time on ABC on Thursday, May 24, 2018.

7. Although titled *The Last Days of Michael Jackson*, the program did not focus on Michael Jackson's last days. Rather, it was simply a mediocre look back at Michael Jackson's life and entertainment career. A *Rolling Stone* review described the program as "offer[ing] little in the way of new revelations or reporting and at times seems heavy on armchair psychoanalysis and unsupported conjecture." The magazine was being too generous. The program contained *nothing* "in the way of new revelations or reporting."

8. Unable to make a compelling presentation about Michael Jackson on its own, Disney decided to exploit the Jackson Estate's intellectual property without permission or obtaining a license for its use. After all, there is always a healthy audience for Michael Jackson's timeless music, his ground-breaking videos, and footage of his unforgettable live performances. Why not just use Michael Jackson's

3
FIRST AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT

1  works if one can get advertisers to buy time on the program? But in order to use
2  these valuable assets, licenses must be obtained for them by the Estate.
3      9.      Like Disney, the lifeblood of the Estate's business is its intellectual
4  property. Yet for some reason, Disney decided it could just use the Estate's most
5  valuable intellectual property for free. Apparently, Disney's passion for the
6  copyright laws disappears when it doesn't involve its own intellectual property, and
7  it sees an opportunity to profit off of someone else's intellectual property without
8  permission or payment.
9      10.     The extent of Disney's use of the Estate's intellectual property in *The
10 Last Days of Michael Jackson* is truly astounding. The program used dozens of
11 copyrighted works owned by the Estate, but obtained no license. In fact, Disney-
12 owned ABC never even approached the Estate to seek a license or let the Estate
13 know what it was doing.
14     11.     In total, the program used portions of at least thirty different
15 copyrighted works owned by the Estate without the Estate's permission.
16     12.     These works include, but are not limited to, the following:
17         (a)     Substantial portions of some of Michael Jackson's most famous
18     music without permission, including Michael's recordings of compositions he
19     authored such as *Billie Jean*, *Beat It, Don't Stop 'Til You Get Enough*, *The
20     Girl is Mine*, and *Leave Me Alone*. Disney used this music without obtaining
21     required permissions from *both* the owners of the sound recordings (the
22     Estate) *and* the owner of the musical compositions (the Estate for most
23     compositions and third parties for a few others).
24         (b)     Extensive parts of Michael Jackson's copyrighted music
25     videos—or "short films" as Michael called them—such as *Michael Jackson's
26     Thriller*, *Billie Jean*, *Black or White*, and *Childhood*. The program used,
27     without permission, substantial portions of well over a dozen Michael Jackson
28     music videos without permission from the Estate.

(c) Considerable parts of Michael Jackson's copyrighted video productions, including: *The Making of Thriller* (which has *only* been released on VHS and has never been released on DVD or any other digital medium) and *Dangerous: The Short Films*.

(d) Concert footage owned by the Estate such as the productions *Michael Jackson: Live at Wembley* and *Michael Jackson: Live in Bucharest*.

(e) Significant parts of the Estate's critically-acclaimed film, *This Is It*, the most successful music documentary in history, which was released shortly after Michael's tragic death; the Estate's 2012 Spike Lee directed documentary, *Bad25*, which was originally licensed to ABC in 2012 for broadcast television (that license has long since expired but ABC and Disney apparently felt free to ignore that fact); and the Estate's 2016 Spike Lee directed documentary *Michael Jackson's Journey from Motown to Off the Wall*. Of course, when the Estate wanted to use clips of Sylvia Chase's 1980 interview of Michael Jackson from ABC's 20/20 for that same documentary, *Michael Jackson's Journey from Motown to Off the Wall*, the Estate sought, obtained, and paid for a license from Disney itself.

(f) Copyrighted footage owned by the Estate that the Estate has never commercially exploited. In particular, the Disney program included footage of one of Michael Jackson's children's heartbreaking remarks about her father at the July 7, 2009 memorial service for Michael Jackson at Staples Center. The Estate has never licensed this footage for commercial use. Yet even after being advised that the Estate owned the copyright in it, Disney cynically used it anyway.

13. The Estate only learned that Disney intended to use *any* of its copyrighted works in the program itself two days before it aired. On May 21, 2018, the Estate contacted The Walt Disney Company's General Counsel when the Estate was informed that the trailer for the special was using certain copyrighted images

5
FIRST AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT

owned by the Estate. The next day, a Disney attorney responded to the Estate and advised that Disney would remove the copyrighted images "as a courtesy."

14. When the Estate asked the Disney attorney if any other copyrighted property belonging to the Estate was being used in the program itself, the Disney attorney replied that some small portions of copyrighted music were being used.

15. When asked *which particular copyrighted music* was being used, the Disney attorney unequivocally refused to answer. Obviously, if Disney thought it was not doing anything wrong, the Disney attorney would have not have refused to tell the Estate what they were doing. The Disney attorney said that its uses were all a "fair use" because the program was a "documentary." When pressed, the Disney attorney kept falling back on the fact that the program was a "documentary." Apparently, Disney's newfound position is that any uses of copyrighted works in "documentaries" is a fair use—presumably, so long as the copyrights are not Disney's. As explained below, this position is dead wrong.

16. The Estate wrote to the General Counsel of The Walt Disney Company, and other legal representatives of Disney, in two further letters on May 22 and May 23, 2018. Disney ignored the Estate's letters. To this day, it has never bothered to respond.

17. Disney's fair use argument is patently absurd. Even setting aside Disney's blatant hypocrisy given its notorious history regarding third party uses of its own copyrighted works, Disney's argument here is one that would probably make even the founders of Napster pause.

18. If Disney's position on fair use of the Estate's copyrights were accepted, a network, studio or producer could make a documentary about Walt Disney, and spend most of the documentary's time using, without Disney's permission, extensive clips of Mickey Mouse, Walt Disney, and Disney movies. Disney's music could play in the background to the narrator and the interviews. Likewise, if Disney's position on fair use of the Estate's copyrights were accepted,

6
FIRST AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT

one could create a two-hour documentary about the *Star Wars* franchise, by summarizing each film and using extensive clips from each film while playing the iconic *Star Wars* music in the background of interviews and narration, and all without permission from Disney. We are confident that Disney would not react kindly to attempts by others to create such projects without getting permission from Disney and paying Disney for the use of its property.

19. Disney's fair use arguments are also completely inconsistent with the practice of documentary filmmakers in general. The Estate is routinely contacted by documentary filmmakers seeking to obtain licenses for Michael Jackson's works. When the Estate makes its own documentaries, it also routinely seeks and obtains licenses before using copyrighted works (including from Disney itself, as discussed above).

20. Disney did not obtain licenses for its extensive use of dozens of the copyrighted works used in *The Last Days of Michael Jackson*.

21. Disney is aware of the Copyright Laws of the United States.

22. Disney knows that permission from the copyright owner must be obtained before using copyright works, particularly in commercial projects like the one at issue here. Disney did not do that. Rather, it engaged in flagrant and willful infringement of the Estate's copyrights. Through this suit, the Estate seeks all appropriate redress for those violations of its rights.

## PARTIES

23. Michael Jackson is one of the most famous entertainers, songwriters and recording artists of all time. His 1982 album, *Thriller*, is the best-selling album of all time. His other original, studio albums as an adult, solo artist—*Off the Wall* (1979), *Bad* (1988), *Dangerous* (1991), *HIStory* (1995), and *Invincible* (2001)—are all classics in their own right. Each was certified platinum several times over.

24. Michael Jackson also revolutionized music videos. His 1983 video for the track, *Thriller*, is the greatest music video of all time. In recognition of its

"cultural, historical and aesthetic significance," it is the only music video to be preserved in the National Film Registry of the Library of Congress. At one point, MTV was playing it every hour, on the hour. In 1991, the video for *Black or White* premiered on prime time on the Fox Network, with Fox earning its single largest audience ever up to that date. Numerous other Michael Jackson music videos—*Beat It*, *Billie Jean, Bad*, *Smooth Criminal*, *Remember The Time*, *You Are Not Alone*, *Ghosts*, *Scream*, and so many others—are also classics in the genre.

25. In addition to all of this, Michael Jackson was among the greatest dancers of all time. Even today, over three decades after he first performed it while dancing to *Billie Jean* at Motown's 25th anniversary special, the "moonwalk" is probably the most well-known contemporary dance move in the world.

26. The plaintiffs are all companies that were founded by the late Michael Jackson and wholly owned by him at his untimely death on June 25, 2009. Today, the plaintiffs are all currently part of the corpus of real and personal properties comprising the Estate of Michael Jackson.

    (a) Plaintiff MJJ Productions, Inc., is a California corporation with its principal place of business in Los Angeles County. It was founded by Michael Jackson and "loaned out" his services as a recording artist during his lifetime. It is the sole owner of substantially all sound recordings created by Michael Jackson as a solo, adult recording artist.

    (b) Plaintiff Optimum Productions ("Optimum") is a California corporation with its principal place of business in Los Angeles County. It was founded by Michael Jackson as a production company through which he produced films. It holds copyright interests in films Michael Jackson owned or produced (or both). Since Michael Jackson's untimely death in 2009, Optimum has continued to produce films, including documentaries about Michael Jackson, his music, and other talents, such as the critically-acclaimed

Spike Lee documentaries *Bad 25* (2012) and *Michael Jackson's Journey from Motown to Off the Wall* (2016).

(c) Plaintiff New Horizons Trust III, LLC ("MIJAC"), is a Delaware limited liability company that does business under the name MIJAC Music with its principal place of business in Los Angeles County. MIJAC Music owns copyrights in musical compositions that Michael Jackson wrote. It also owns copyrights in musical compositions written by others that Michael Jackson acquired throughout the years.

(d) Plaintiff The Michael Jackson Company, LLC ("TMJC"), is a Delaware limited liability company founded by Michael Jackson with its principal place of business in Los Angeles County. It is the owner of the copyright in the film *Michael Jackson's This Is It*, the highest-grossing music documentary of all time, along with various other copyrights associated with the film and rehearsals for the planned *This Is It* concerts in London.

(e) Plaintiff MJJ Ventures, Inc., is a California corporation founded by the late Michael Jackson with its principal place of business in Los Angeles County. It is the registrant of certain copyrighted works created in whole or in part by the late Michael Jackson.

27. When unnecessary to distinguish between the plaintiffs, they are referred to collectively in this pleading simply as "the Estate."

28. Defendant The Walt Disney Company is a Delaware corporation with its principal place of business in Los Angeles County.

29. Defendant ABC, Inc. ("ABC") is, on information and belief, a wholly-owned subsidiary of The Walt Disney Company. On information and belief, it is a Delaware corporation with its principal place of business in Los Angeles County.

30. Defendants DOES 1 through 10, inclusive, are individuals and entities who were involved in, or were responsible in some manner for, some or all of the acts of infringement alleged herein, and they are liable to the Estate for those

infringements. The Estate will amend this complaint to state the true names and capacities of DOES 1 through 10 when their names and capacities, along with facts respecting their responsibility for the infringements, have been ascertained.

## FURTHER ALLEGATIONS

31. On June 25, 2009, Michael Jackson passed away as a result of a homicide by his "doctor." He was just two months shy of his 51st birthday.

32. ABC aired *The Last Days of Michael Jackson* on or around May 24, 2018 at 8 p.m. and 7 p.m., Central Time. ABC included advertising between segments of *The Last Days of Michael Jackson* and was paid for such advertising.

33. ABC has made *The Last Days of Michael Jackson* available on the internet such that viewers could view the program on demand on personal computers, tablets, mobile devices, and internet enabled televisions.

34. On information and belief, ABC plans to re-air *The Last Days of Michael Jackson* on television in the future.

35. On information and belief, ABC plans to sell, digital and physical copies of *The Last Days of Michael Jackson*.

36. On information and belief, ABC plans to license *The Last Days of Michael Jackson* to other television providers, both domestically and internationally.

37. As relevant to the production and airing of *The Last Days of Michael Jackson*, ABC was acting as an agent for The Walt Disney Company such that The Walt Disney Company is liable for ABC's copyright infringement alleged herein. On information and belief, The Walt Disney Company exercises a high degree of control over ABC; there is an extraordinarily close relationship between The Walt Disney Company and ABC; there is an overlap in the officers and directors of The Walt Disney Company and ABC; and the revenues of ABC are a part of the revenues of The Walt Disney Company generally.

38. As relevant to the production and airing of *The Last Days of Michael Jackson*, The Walt Disney Company is also liable for ABC's copyright infringement

alleged herein pursuant to the doctrine of vicarious infringement. On information and belief, The Walt Disney Company has the right and ability to control ABC's content generally, and had the right and ability to control the production and airing of *The Last Days of Michael Jackson*, specifically. On information and belief, The Walt Disney Company received a financial benefit from the production and airing of *The Last Days of Michael Jackson*.

39.  As relevant to the production and airing of *The Last Days of Michael Jackson*, The Walt Disney Company is also liable for ABC's copyright infringement alleged herein pursuant to the doctrine of contributory infringement. The Walt Disney Company knew of ABC's planned infringing activity with respect to the production and airing of *The Last Days of Michael Jackson*. Its General Counsel was sent numerous letters about the subject in the days prior to airing of the program, and ignored the last two letters. On information and belief, The Walt Disney Company, owner of ABC, knew of the alleged infringing activity, and induced, caused, or materially contributed to the production and airing of *The Last Days of Michael Jackson*.

40.  The Estate's investigation is ongoing. The Estate believes that further copyrighted works owned by it were infringed by the documentary including other concert footage not listed here and several photographs and images, the copyrights to which the Estate owns. The Estate will amend this Complaint with those further works when further information is discovered.

## FIRST CLAIM FOR RELIEF: COPYRIGHT INFRINGEMENT
## OF MICHAEL JACKSON'S SOUND RECORDINGS

41.  MJJ Productions is the owner of copyrights in the following sound recordings, which have been registered with the United States Copyright Office:

(a) *Don't Stop 'Til You Get Enough* (sound recording)

(b) *Human Nature* (sound recording)

(c) *Billie Jean* (sound recording)

(d) *Thriller* (sound recording)

(e) *Beat It* (sound recording)

(f) *The Girl is Mine* (sound recording)

(g) *Bad* (sound recording)

(h) *Leave Me Alone* (sound recording)

(i) *Childhood* (sound recording)

42. The copyrights in the sound recordings listed in (a) through (f) above were originally owned by predecessors and affiliates of Sony Music Entertainment. However, those copyrights were assigned to MJJ Productions in or around 1985.

43. Defendants used the above sound recordings in *The Last Days of Michael Jackson* without consent or license from MJJ Productions.

44. To the extent it may not have directly used these sound recordings, The Walt Disney Company is liable for such infringements because ABC is, for purposes of infringement here, its agent. The Walt Disney Company is also liable for such infringements pursuant to either or both the doctrines of vicarious infringement and contributory infringement.

45. As a result of Defendants' acts and omissions as described above, MJJ Productions has suffered damages and will continue to suffer damages in an amount that is presently unknown.

46. Defendants' infringement entitles MJJ Productions to recover its actual damages and Defendants' profits attributable to the infringement.

47. Defendants' infringement entitles MJJ Productions to recover statutory damages in the maximum amount permitted by 17 U.S.C. § 504.

48. Defendants' infringement was willful.

49. Defendants' infringement entitles MJJ Productions to recover its attorneys' fees pursuant to 17 U.S.C. § 505.

50. Defendants' infringement of MJJ Productions' copyrights have caused and will cause irreparable harm to MJJ Productions that cannot be fully

compensated by money. Because MJJ Productions has no adequate remedy at law, MJJ Productions is entitled to appropriate injunctive relief prohibiting Defendants from further unauthorized use of MJJ Productions' copyrighted sound recordings.

## SECOND CLAIM FOR RELIEF: COPYRIGHT INFRINGEMENT OF MICHAEL JACKSON'S MUSICAL COMPOSITIONS

51. MIJAC is the owner of the copyrights in the following musical compositions, which have been registered with the United States Copyright Office:

(a) *Don't Stop 'Til You Get Enough* (composition)

(b) *Billie Jean* (composition)

(c) *Beat It* (composition)

(d) *The Girl is Mine* (composition)

(e) *Bad* (composition)

(f) *Leave Me Alone* (composition)

(g) *Childhood* (composition)

52. Defendants used all of the above musical compositions in *The Last Days of Michael Jackson* without consent or license from MIJAC.

53. To the extent it may not have directly used these musical compositions, The Walt Disney Company is liable for such infringements because ABC is, for purposes of infringement here, its agent. The Walt Disney Company is also liable for such infringements pursuant to either or both the doctrines of vicarious infringement and contributory infringement.

54. As a result of Defendants' acts and omissions as described above, MIJAC has suffered damages and will continue to suffer damages in an amount that is presently unknown.

55. Defendants' infringement entitles MIJAC to recover its actual damages and Defendants' profits attributable to the infringement.

56. Defendants' infringement entitles MIJAC to recover statutory damages in the maximum amount permitted by 17 U.S.C. § 504.

57. Defendants' infringement was willful.

58. Defendants' infringement entitles MIJAC to recover its attorneys' fees pursuant to 17 U.S.C. § 505.

59. Defendants' infringement of MIJAC copyrights have caused and will cause irreparable harm to MIJAC that cannot be fully compensated by money. Because MIJAC has no adequate remedy at law, MIJAC is entitled to appropriate injunctive relief prohibiting Defendants from further unauthorized use of MIJAC copyrighted musical compositions.

## THIRD CLAIM FOR RELIEF: COPYRIGHT INFRINGEMENT OF MICHAEL JACKSON'S AUDIOVISUAL WORKS

60. Optimum is the owner of the copyrights in the following music videos (i.e., "short films") and other audivisual works, all of which have been registered with the United States Copyright Office (some of which are registered in the name of MJJ Ventures, or in the names of defunct entities that were merged into Optimum):

    (a) *Michael Jackson's Thriller* (short film)

    (b) *Billie Jean* (short film)

    (c) *Bad* (short film)

    (d) *Smooth Criminal* (short film)

    (e) *The Way You Make Me Feel* (short film)

    (f) *Dirty Diana* (short film)

    (g) *Jam* (short film)

    (h) *Leave Me Alone* (short film)

    (i) *Black or White* (short film)

    (j) *Remember the Time* (short film)

    (k) *In the Closet* (short film)

    (l) *Scream* (short film)

    (m) *Don't Stop 'Til You Get Enough* (short film)

    (n)  *Making of Michael Jackson's "Thriller"*

    (o)  *Dangerous: The Short Films*

    (p)  *Michael Jackson: Live in Bucharest*

    (q)  *Bad 25*

61. Optimum is the owner of the copyright in the audivisial work, *Michael Jackson's Journey from Motown to Off the Wall*, and has filed an application to register the copyright in that work with the Copyright Office. The audivisual work, *Michael Jackson's Journey from Motown to Off the Wall*, is a fixed, original work of authorship entitled to copyright protection under the laws of the United States.

62. MJJ Productions is the owner of the copyrights in the following music videos and other audivisual works, all of which have been registered with the United States Copyright Office:

    (a)  *Beat It* (short film)

    (b)  *Childhood* (short film)

    (c)  *Ghosts* (short film)

    (d)  *Michael Jackson: Live at Wembley* (registered as *Bad: 25th Anniversary Deluxe Edition DVD*)

63. Defendants used all of the above audivisual works in *The Last Days of Michael Jackson* without consent or license from the Estate.

64. To the extent it may not have directly used these audivisual works, The Walt Disney Company is liable for such infringements because ABC is, for purposes of infringement here, its agent. The Walt Disney Company is also liable for such infringements pursuant to either or both the doctrines of vicarious infringement and contributory infringement.

65. As a result of Defendants' acts and omissions as described above, Optimum, MJJ Productions, and MJJ Ventures have suffered damages and will continue to suffer damages in an amount that is presently unknown.

66. Defendants' infringement entitles Optimum, MJJ Productions, and MJJ Ventures to recover their actual damages and Defendants' profits attributable to the infringement.

67. Defendants' infringement entitles Optimum, MJJ Productions, and MJJ Ventures to recover statutory damages in the maximum amount permitted by 17 U.S.C. § 504.

68. Defendants' infringement was willful.

69. Defendants' infringement entitles Optimum, MJJ Productions, and MJJ Ventures to recover their attorneys' fees pursuant to 17 U.S.C. § 505.

70. Defendants' infringement of the copyrights in audiovisual works of Optimum, MJJ Productions, and MJJ Ventures has caused and will cause irreparable harm to Optimum, MJJ Productions, and MJJ Ventures that cannot be fully compensated by money. Because Optimum, MJJ Productions, and MJJ Ventures have no adequate remedy at law, Optimum, MJJ Productions, and MJJ Ventures are entitled to appropriate injunctive relief prohibiting Defendants from further unauthorized use of the copyrighted audiovisual works of Optimum, MJJ Productions, and MJJ Ventures.

**FOURTH CLAIM FOR RELIEF: COPYRIGHT INFRINGEMENT OF MICHAEL JACKSON'S THIS IS IT AND RELATED WORKS**

71. TMJC is the owner of federally registered copyright in the motion picture, *Michael Jackson's This Is It*, in still photographs from the rehearsals that led to the motion picture, and in footage of the July 7, 2009 memorial service for Michael Jackson at Staples Center.

72. Defendants used these works in *The Last Days of Michael Jackson* without consent or license from TMJC.

73. To the extent it may not have directly used these works, The Walt Disney Company is liable for such infringements because ABC is, for purposes of infringement here, its agent. The Walt Disney Company is also liable for such

1 infringements pursuant to either or both the doctrines of vicarious infringement and
2 contributory infringement.

3     74. As a result of Defendants' acts and omissions as described above,
4 TMJC has suffered damages and will continue to suffer damages in an amount that
5 is presently unknown.

6     75. Defendants' infringement entitles TMJC to recover its actual damages
7 and Defendants' profits attributable to the infringement.

8     76. Defendants' infringement entitles TMJC to recover statutory damages
9 in the maximum amount permitted by 17 U.S.C. § 504.

10     77. Defendants' infringement was willful.

11     78. Defendants' infringement entitles TMJC to recover its attorneys' fees
12 pursuant to 17 U.S.C. § 505.

13     79. Defendants' infringement of TMJC's copyrights has caused and will
14 cause irreparable harm to TMJC that cannot be fully compensated by money.
15 Because TMJC has no adequate remedy at law, TMJC is entitled to appropriate
16 injunctive relief prohibiting Defendants from further unauthorized use of TMJC
17 copyrighted works.

# PRAYER FOR RELIEF

A. For damages according to proof at trial;

B. For all profits attributable to Defendants' infringement;

C. For maximum statutory damages pursuant to 17 U.S.C. §504;

D. For attorneys' fees and costs of suit pursuant to 17 U.S.C. § 505;

E. For prejudgment and postjudgment interest to the maximum extent permitted by law;

F. For a declaration that Defendants have infringed the Estate's copyrights, as set out above, and that such infringements were willful; and

G. For appropriate injunctive relief prohibiting Defendants from using the Estate's copyrighted works without license.

DATED: July 30, 2018

Respectfully Submitted,

KINSELLA WEITZMAN ISER
KUMP & ALDISERT LLP

By: /s/
Howard Weitzman
Jonathan P. Steinsapir
Attorneys for Plaintiffs MJJ Productions, Inc., Optimum Productions, Inc., New Horizons Trust III, LLC (d/b/a MIJAC Music), The Michael Jackson Company, LLC, and MJJ Ventures, Inc.

## DEMAND FOR JURY TRIAL

Pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38, plaintiffs, and each of them, demand a trial by jury on all issues so triable.

DATED: July 30, 2018                    Respectfully Submitted,

KINSELLA WEITZMAN ISER
KUMP & ALDISERT LLP


By:    /s/
　　　Howard Weitzman
　　　Jonathan P. Steinsapir
　　　Attorneys for Plaintiffs MJJ Productions, Inc., Optimum Productions, Inc., New Horizons Trust III, LLC (d/b/a MIJAC Music), The Michael Jackson Company, LLC, and MJJ Ventures, Inc.

10386.00337/569604